The exceptions taken at the trial were directed to be heard in the first instance at a general term. The principal, and only one insisted on, was to the decision of the judge dismissing the plaintiffs' complaint. The general term ordered a new trial, on the ground that this ruling was erroneous — holding that the case should have gone to the jury. The action was to recover the possession of two bonds (in terms payable to bearer transferable by delivery), for $1,000 each, issued by the Toledo, Norwalk 
Cleveland Railroad Company, alleged to be detained by the defendant. The bonds had been purchased for the defendant by his brokers, in December, 1860, in the usual course of business, and without actual notice of any defect in them, or in the title of the seller. The plaintiffs claimed that they were the owners of the bonds. If, therefore, there was evidence tending to prove the plaintiffs' ownership and the defendant's purchase of them in bad faith, it was error to withhold the case from the jury.
It seems to me that when the case was rested, the testimony failed utterly to show title in the plaintiffs to the bonds in question; and if the jury had given them a verdict, it would have been the result of mere speculation and conjecture. They were the owners, in the fore part of November, 1860, of five bonds of $1,000 each of the Toledo, *Page 245 
Norwalk Cleveland Railroad Company, bearing the numbers 336, 337, 338, 339, and 340; which bonds were left at the Fulton Bank in a box, and the box was afterwards lost or stolen. The bonds in suit of a similar description, which were admitted to be genuine, bore the numbers 225 and 238. Of course, to make any case on the part of the plaintiffs, it was necessary for them to show that the latter were two of their bonds that had been lost or abstracted. The bonds issued by the company were alike in all respects except the numbering; but those in suit were numbered differently from those formerly belonging to the plaintiffs. The theory of the plaintiffs was, that the defendant's bonds were two of their lost bonds, which had been altered in these numbers. Was there any evidence to go to the jury as to the identity of the bonds which were the subject of the action with those lost by the plaintiffs?
If the defendant's bonds were the genuine and original Nos. 225 and 238, there could, of course, have been no pretense that they ever were the property of the plaintiffs. It was then primarily essential to show that the numbers had been altered. This was a fact susceptible of direct proof, but none was given. There would have been no difficulty whatever in proving by the secretary of the company, who filled up and numbered the whole series of bonds, or by others familiar with his handwriting, that the numbers on the bonds had in fact been altered. The bonds were open for examination on the trial; they had been seen and examined before the trial by some of the officers of the company; the person who numbered them was one of the plaintiffs' witnesses, yet no questions were asked or attempt made to prove by them that the numbers upon the bonds were not in the handwriting of the person originally numbering the series. All the evidence introduced, bearing in the remotest degree on the question of alteration, was this: The series of bonds when issued were numbered consecutively, from No. 1 to No. 525; there was no duplicate *Page 246 
numbers either of bonds or coupons issued; for some ten years after issue, no duplicate coupons had been seen by the company's paying agent in New York; in February, 1861, duplicate coupons of the numbers 225 and 238 appeared and were paid by the Corn Exchange Bank, and returned to the company; and there were in existence two other bonds numbered 225 and 238. This did not tend to prove that the numbers on the defendant's bonds had been altered, or that they were not the genuine and original Nos. 225 and 238. Had it been shown that the numbers upon the other two bonds, admitted to be in existence, were in the handwriting of the officers of the company — or any proof whatever given that they were not altered or spurious; or had it been shown in any way that the duplicate coupons, numbered 225 and 238, which had appeared and been paid, were genuine and not altered ones — there would have been something for the jury. But, in these respects, there was an entire absence of proof. Under the circumstances, it would have been a mere matter of conjecture with the jury, that the numbers on the defendant's bonds had been altered and those upon the other two had not; and that the bonds in suit were not the genuine and original Nos. 225 and 238, but those produced on the trial simply to show their existence, and in relation to which no evidence was offered, were.
If, however, it were admitted that the numbers on the defendant's bonds had been altered, was there really any evidence that they had been so altered from any of the bonds belonging to the plaintiffs? The proof showed, as has been stated, that the bonds issued were numbered consecutively from 1 to 525, and that there was but one bond of each number. There was also evidence tending to show that for nearly ten years after such issue only one bond and accompanying coupons of the numbers 225 and 238 respectively, was ever seen by the company, or its agents, or paid upon; that when the coupons of 1st February, *Page 247 
1861, were paid by their agents, and returned to the company, they amounted to $105 (the amount of their coupons) more than the entire sum due for coupons maturing at that date, counting as outstanding the numbers 336, 337, 338, 339 and 340 (the numbers of the plaintiffs' bonds), which were not returned as paid; that on examination by the company it was discovered that there wereduplicate coupons returned of the numbers 225, 238 and 455; that in August, 1861, duplicates of numbers 224 and 234 were returned to the company's office from their paying agent in New York, making five duplicate coupons, duplicating the numbers 224, 225, 234, 238 and 455; that the coupons numbered from 336 to 340 (being the numbers of the plaintiffs' five bonds) maturing after August, 1860, had not, as late as December, 1862, been returned; and that bonds of the numbers 225 and 238 respectively, other than those held by the defendant, were in existence. This was all the proof. It undoubtedly tended to show that there were not two bonds originally issued bearing the number 225, and bonds bearing the number 238, and that either the defendant's bonds or the two others of like number admitted to be in existence, had been altered; but as to which of them had been altered the evidence furnished no possible clue. The two bonds, numbered 225 and 238, other than the defendant's, were not produced except for the purpose of showing their existence, and as to their condition or appearance there was no proof whatever. The evidence also tended to the conclusion that the alteration of one or the other of the two classes of bonds were alterations of other original numbers into numbers 225 and 238; but there was no proof whatever from which the jury could legitimately infer that either were two of the bonds lost by the plaintiffs from which the original numbers had been erased and the numbers 225 and 238 substituted. That there were duplicate coupons of numbers 225 and 238 returned to the company, and no coupons of the numbers of the plaintiffs' *Page 248 
bonds returned up to December, 1862, did not tend to show it. Coupons from any other of the 525 bonds may have been altered. Mistakes may have been made in the numbering of the coupons, a thing not unlikely to happen. Mistakes were made in this matter of numbering, as coupons, having no numbers were proved to have been paid and returned to the company. So, also, the duplicate coupons may have been forged. Nor would the fact that the coupons of two of the numbers of the plaintiffs' bonds were outstanding in December, 1862, not having been paid or returned to the company, have justified the jury in presuming that the original numbers had been erased from any of the plaintiffs' bonds.
Had the question, therefore, of the plaintiffs' ownership of the bonds which were the subject of the suit been left to the jury, they would have been compelled, I think, to decide it upon mere conjecture, and not upon testimony. As the plaintiffs' bonds were lost or stolen in November, 1860, the defendant purchasing his in December following, and as what purported to be duplicate coupons of Nos. 225 and 238 (the numbers of the defendant's bonds), were presented in February, 1861, paid and returned to the company's office, and no coupons bearing the numbers of the plaintiffs' bonds had been paid or returned since their bonds were lost or stolen; and as two other bonds numbered 225 and 238 were shown to be in existence, the jury might have suspected or conjectured that the bonds in the defendant's hands were the lost or stolen property of the plaintiffs; but it would have been mere conjecture. The proof was utterly defective on which to rest any legal or reasonable presumption, either that the defendant's bonds were not the genuine and original Nos. 225 and 238, or that they ever belonged to the plaintiffs. The case, in my judgment, which the judge refused to submit to the jury, was not one of insufficient proof merely, but one of an absence of proof.
If the proof were defective and incomplete as to the plaintiffs' *Page 249 
ownership of the bonds, the question of the good or bad faith of the defendant's purchase was of no importance. But I think the facts show there was no bad faith in the purchase. The defendant or his brokers, it is not pretended, had actual notice of any defect in the title of the party from whom the bonds were purchased; nor do I think upon the facts as proved, the law imputed notice to him. This question, however, was for the court and not the jury. The facts, as to the appearance and condition of the bonds, were undisputed; and the instruments were in court where the defects alleged might be seen on inspection. There was no conflict as to the facts to be settled by the jury, and the circumstances from which notice was to be inferred were not extraneous to the instruments themselves. Constructive notice is a legal inference from established facts; and when the facts are not controverted, or the alleged defect or infirmity appears on the face of the instrument, and is a matter of ocular inspection, the question is one for the court. Whether, under a conceded state of facts, the law will impute notice to the purchaser, is not a question for the jury. Now, what were the circumstances of the purchase which it is alleged affected the defendant with notice? There was a piece of paper pasted on the back of one of the bonds, and also of some of the coupons; and on being held up to the light, the paper where some of the numbers of the coupons were, appeared to be thin and worn. This was all. Was there anything in this appearance of the bonds to suggest the idea that the seller had no title to them, or calculated to excite the suspicion or notice of a prudent purchaser of negotiable instruments offered in the market for sale? I think not. It is not denied that in the body of the instrument, including the signatures and seal of the company and the certificate of the trustee, they were in all respects the genuine obligations of the company, and were in the usual and proper condition. All that can be claimed is, that if *Page 250 
the defendant's brokers had made a close and critical examination they might have discovered such marks upon them as would have indicated that the numbers had been altered. The purchaser of a bond or other negotiable instrument, in open market and in the usual course of business, is not bound to make such an examination to escape the imputation of bad faith in the purchase. But, had the defendant's brokers, by close inspection, been able to see marks indicating that the numbers of the bonds had been altered, it would not have been notice of any defect or irregularity in the bonds themselves, or in the seller's title to them. The numbers are no integral part of the bonds themselves; and it would be a violent and unjust presumption to assume that a change in the mere numbering of a bond, or other quasi
negotiable instrument, offered for sale in the usual course, is, as a matter of law, notice, or any intimation even, of a larceny of it. The rights of a purchaser are not to be affected by constructive notice, unless it clearly appear that the inquiry suggested by the facts disclosed at the time of the purchase would, if fairly pursued, result in the discovery of the defect existing but hidden at the time. There must appear to be, in the nature of the case, such a connection between the facts discovered and the further facts to be discovered, that the former may be said to furnish a clue — a reasonable and natural clue — to the latter. The hidden facts to be discovered in this case, upon the plaintiffs' theory, were the loss of the bonds in suit by the plaintiffs, and their title to recover them. The mere knowledge that the numbers on the bonds had been changed (conceding that their appearance disclosed the fact), gave the purchaser no clue whatever, which, if followed up, would necessarily, or even probably, lead to a discovery of these facts. There was no natural or logical connection between them; nor was there any evidence in the case that would warrant any such conclusion. The plaintiffs' evidence clearly showed that, as matters of fact, *Page 251 
the mere alteration of the numbers, if any, could not and did not suggest the idea that the bonds purchased by the defendant's brokers were the plaintiffs' bonds, or that there was any defect in them. They had passed through the hands of other brokers and bankers before the defendant purchased them, who saw nothing suspicious in their appearance. Both the treasurer of the company and its agent in New York, after their suspicions were aroused, made a critical and careful examination of them, and reported them in all respects regular, and the coupons for August, 1861, were paid. The treasurer was not even sure that there had been any alteration of the numbers. These were facts proved by the plaintiffs, as a part of their case. The evidence disproved, as matter of fact, that there was anything in the appearance of the bonds, when the defendant purchased them, calculated to excite the suspicion or notice of a prudent purchaser.
The order of the general term, granting a new trial should be reversed, and the judgment of the special term affirmed.
All the judges concurred except Judges MULLIN and SELDEN, who were for affirming the judgment of the general term. Judgment reversed. *Page 252